UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                            Plaintiff,<br><br>v.<br><br>CROWN BRIDGE PARTNERS, LLC,<br>SOHEIL AHDOOT, and<br>SEPAS AHDOOT,<br><br>                                            Defendants. | **COMPLAINT**<br><br>Civil Action No. 22-cv-6537 |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants Crown Bridge Partners, LLC ("Crown Bridge"), Soheil Ahdoot ("Soheil"), and Sepas Ahdoot ("Sepas") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. From January 1, 2016 through December 31, 2020 ("Relevant Period"), Crown Bridge and its managing members and owners Soheil and Sepas acted as securities dealers, engaged in the business of buying and selling large volumes of penny stocks for their own account, without being registered as a dealer with the SEC and without Soheil or Sepas associating with an SEC-registered dealer.

2. Crown Bridge's business model was to buy convertible notes—a type of security—from penny stock issuers for the exclusive benefit of Soheil and Sepas, to convert the notes into unrestricted, newly issued shares of stock at a substantial discount to the then-prevailing market price (typically 25% to 50%), and then to quickly resell those shares into the public markets to capture the benefit of the discount.

3. During the Relevant Period, Crown Bridge, through Soheil and Sepas, purchased approximately 250 convertible notes from approximately 150 different penny stock issuers,

many of which sold multiple notes to Crown Bridge over time. Through these notes, Crown Bridge was issued billions of unrestricted, newly issued shares of common stock. It resold approximately 35 billion newly issued, post-conversion shares into the public markets and generated millions in profits. By engaging in this business, Crown Bridge operated as an unregistered securities dealer.

4. By failing to comply with the dealer registration requirements of the Securities Exchange Act of 1934 ("Exchange Act"), Crown Bridge, Soheil, and Sepas avoided certain regulatory obligations for dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

5. Crown Bridge continues to hold unconverted notes, unexercised warrants obtained in conjunction with convertible notes, and shares derived from converted notes.

## **VIOLATIONS**

6. By virtue of the conduct alleged herein, Defendants have violated Exchange Act Section 15(a) [15 U.S.C.§ 78o(a)]. Defendants Soheil and Sepas are also liable under Exchange Act Section 20(a) as control persons for Crown Bridge's violations of Exchange Act Section 15(a) [15 U.S.C. § 78t(a)].

7. Unless Defendants are restrained and enjoined, Defendants will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object. The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief, including penny stock bars.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action, and venue lies in this District, pursuant to Exchange Act Sections 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa]. Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint. These transactions, acts, practices, and courses of business occurred largely within the Southern District of New York, where Crown Bridge is located and does business, and where Soheil and Sepas worked during the Relevant Period.

## DEFENDANTS

9. **Crown Bridge Partners, LLC** is a New York Limited Liability Company, created in 2013, which principally operated out of office space in New York, New York. Its members are Soheil and Sepas Ahdoot, brothers, who each own a 50% interest in the company. Crown Bridge is mainly engaged in the convertible notes business. It trades Soheil and Sepas's own capital, has never accepted money from third parties, and never had any employees or contracted laborers. Crown Bridge has never been registered with the SEC in any capacity.

10. **Soheil Ahdoot**, age 39, resides in Great Neck, New York, and is a managing member and 50% owner of Crown Bridge. Soheil shares responsibilities for the business with his brother, Sepas. Soheil previously held a Series 7 securities license that is no longer active, nor was active during the Relevant Period. During the Relevant Period, Soheil was not registered as a dealer or associated with an SEC-registered dealer.

11. **Sepas Ahdoot**, age 35, resides in Great Neck, New York, and is a managing member and 50% owner of Crown Bridge. Sepas shared responsibilities for the business with his

brother, Soheil. Sepas has never been registered with the SEC in any capacity and, during the Relevant Period, he was not associated with an SEC-registered dealer.

## FACTS

12. During the Relevant Period, Crown Bridge, acting through Soheil and Sepas, operated a business in New York, New York, through which Crown Bridge purchased approximately 250 convertible notes from approximately 150 penny stock issuers.

13. Soheil and Sepas each owned 50% of Crown Bridge and were its only employees throughout the Relevant Period. Together they managed the day-to-day operations of Crown Bridge and shared all decision making authority over Crown Bridge's convertible notes business.

14. Soheil and Sepas sourced convertible note opportunities for Crown Bridge through multiple channels. Initially, they reviewed OTCMarkets.com, a website that includes a news feed of SEC filings and press releases from penny stock issuers, and identified issuers that appeared to need or had expressed a need for financing. They then cold called the issuers directly. Over time, as Crown Bridge grew its business and became known in the industry, issuers, brokers, and finders reached out directly to Soheil and Sepas to seek funding.

15. Soheil and Sepas negotiated the terms of the Stock Purchase Agreements ("SPAs") through which Crown Bridge purchased convertible notes directly from penny stock issuers, thereby funding the issuers. They also negotiated the terms of the notes. The notes typically contained terms that were highly favorable to Crown Bridge and reduced Crown Bridge's exposure to market risk, including, but not limited to: (a) a conversion discount ranging from 25% to 50% to the prevailing "market price," a term the notes typically defined as the lowest trading price, or lowest closing bid price, of the issuer's common stock during the 10 to 25 days on or before the date of the conversion notice; (b) the right to obtain additional discounts

under certain circumstances; (c) prepayment penalties that discouraged issuers from prepaying the notes within the first 180 days and that included an outright prohibition against prepayments after 180 days; and (d) the right to convert the notes in increments, enabling Crown Bridge to convert what it could sell immediately, while shielding the remaining balance from exposure to market price movements. In certain convertible note transactions, Soheil and Sepas also negotiated for Crown Bridge to receive warrants as an incentive for Crown Bridge to fund multiple funding tranches of a particular note.

16. Soheil and Sepas executed all documents necessary for Crown Bridge (a) to enter into the SPAs, (b) acquire the convertible notes, (c) fund the convertible notes, (c) convert the notes and exercise the warrants, (d) deposit the shares into Crown Bridge's brokerage accounts, and (e) sell the shares into the public markets.

17. Crown Bridge typically held the notes for six months, or until such time as it could claim the SEC Rule 144 exemption from registration [17 C.F.R. § 230.144]. SEC Rule 144 allows non-affiliates who acquire restricted stock directly from the issuer in a private transaction to resell it free of restriction into the market after observing a holding period, among other requirements.

18. Crown Bridge converted the notes with an eye toward distributing the underlying shares into the public markets for a profit based on the spread between the market price and the discounted acquisition price, as opposed to holding the shares for appreciation.

19. Crown Bridge generally converted the notes in several increments. Soon after its receipt of post-conversion shares, it began selling the shares into the public markets. Crown Bridge typically sold the shares from one conversion before issuing another conversion notice.

20. The conversion price was recalculated for each incremental conversion, so that Crown Bridge received the discount on the then-current market price, regardless of whether the market price had increased or decreased since the last conversion. This mechanism protected Crown Bridge's profits and insulated it from the risk of a downward fluctuation of an issuer's stock price. This limited exposure to market risk is a common attribute of a securities dealer.

21. In all, during the Relevant Period, Crown Bridge sold into the public markets approximately 35 billion shares of unrestricted, post-conversion shares of penny stock issuers, for millions of dollars in profits. It derived those profits principally from the discounted acquisition price, not from appreciation in the market price of the issuer's common stock. Acquiring stock at a discount and selling it at a spread or markup is a common attribute of a securities dealer.

22. Crown Bridge obtained nearly all of the stock that it sold during the Relevant Period directly from issuers through its convertible notes business, and not from purchases in the secondary market.

23. Crown Bridge's public sale of unrestricted, newly issued shares significantly increased the amount of shares trading publicly and the issuers' unrestricted share totals.

24. The following are examples of Crown Bridge's relationship with three penny stock issuers during the Relevant Period, which highlight how Crown Bridge purchased and funded convertible notes, exercised its conversion rights, and sold the resulting unrestricted, newly issues shares into the public markets for a profit:

## Grey Cloak Tech Inc.

25. On August 12, 2016, Crown Bridge executed an SPA with Grey Cloak Tech, Inc. ("GRCK"), a Nevada corporation headquartered in Las Vegas. Pursuant to the SPA, Crown

Bridge purchased a master note from GRCK in the principal amount of $300,000. Crown Bridge was obligated to fund an initial tranche for $25,000. Crown Bridge had sole discretion over whether to fund additional tranches.

26. In total, Crown Bridge funded six tranches of the master note between August 2016 and January 2018, representing a total principal amount of $220,000. Crown Bridge also received warrants from GRCK as incentive for funding the additional tranches.

27. The note had an 8% interest rate and a 12-month maturity date for each funded tranche. Crown Bridge's conversion price was equal to the lesser of $0.05 per share or 56% of the lowest traded price (i.e., a 44% discount) of GRCK common stock for the 20 trading dates prior to the conversion date. It was entitled to additional discounts of up to 20% (for a total possible discount of 64%) if certain conditions occurred between the funding date and the conversion date.

28. GRCK was entitled to prepay any amount outstanding under the note during the first 180 days from the note issuance date for a cash amount ranging from 115% to 140% of the prepayment amount, if Crown Bridge agreed (in its sole discretion) to the prepayment in writing. Prepayments were prohibited after 180 days.

29. On February 22, 2017, exactly six months after it funded the first tranche, Crown Bridge began converting the principal into shares. By March 6, 2017, Crown Bridge made three incremental conversions of the principal, receiving a 64% discount from the market price on all three conversions, and more than 1,200,000 unrestricted, newly issued shares of GRCK common stock. Crown Bridge began selling the post-conversion shares within one to two business days after each conversion and sold out the entire lot of post-conversion shares within days or weeks. Crown Bridge then converted more of the note principal, repeating the cycle.

30. In all, Crown Bridge fully converted the first three tranches of the note, and it partially converted the fourth tranche. It executed 13 conversion notices and generally began the conversion process six to seven months after the funding date of each tranche, to satisfy the SEC Rule 144 holding requirements.

31. Through the note conversions and exercising related incentive warrants, Crown Bridge received over 50 million unrestricted, newly issued shares of GRCK common stock before GRCK's 1:250 reverse stock split in 2018, and an additional 355,000 unrestricted newly issued shares after the reverse split. Crown Bridge sold all of these unrestricted, newly issued GRCK shares at a substantial profit.

## DigitalTown, Inc.

32. On September 27, 2018, Crown Bridge executed an SPA with DigitalTown, Inc. ("DGTW"), a Minnesota corporation, headquartered in Bellevue, Washington, pursuant to which it purchased a master note from DGTW in the principal amount of $165,000.

33. On October 4, 2018, Crown Bridge funded the first tranche of the note for $52,000. Crown Bridge had sole discretion to fund additional tranches but did not provide additional funding.

34. The note had a 10% interest rate and a 12-month maturity date for each funded tranche. Crown Bridge was entitled to convert the outstanding principal plus accrued interest, in full or part, at any time. Crown Bridge's conversion price was to be calculated as 61% of the average (i.e., a 39% discount) of the lowest three trading prices or the lowest three closing bid prices of DGTW common stock during the 20 trading days before the conversion date. Crown Bridge was entitled to additional discounts of up to 41% (for a possible total discount of 80%) if certain conditions occurred between the funding date and the conversion notice date.

35. DGTW was entitled to prepay any amount outstanding under a tranche during the first 180 days after issuance of the tranche, for an increased amount ranging from 120% to 145% of the amount being repaid, if Crown Bridge agreed (in its sole discretion) to the prepayment in writing. Prepayments were prohibited after 180 days.

36. On April 4, 2019, exactly six months after the SEC Rule 144 holding period had been satisfied, Crown Bridge began converting the note. It received 9,200,000 unrestricted, newly issued shares in its initial conversion, at a 39% discount to the then-prevailing market price, and sold all of the shares on April 12, 2019.

37. Between April 4, 2019, and May 28, 2019, Crown Bridge issued nine conversion notices, converting the entire principal balance of the first tranche, plus interest and penalties, into 175,270,000 unrestricted shares of DGTW common stock. Crown Bridge typically began selling the shares immediately, and sold out its inventory of post-conversion shares in days. Crown Bridge then issued another conversion notice, and repeated the cycle until the entire principal balance, plus interest and penalties, were converted and all shares were sold.

38. Crown Bridge sold all 175,270,000 unrestricted, newly issued shares of DGTW that it acquired through the convertible note for substantial profits.

**Bemax, Inc.**

39. On April 19, 2016, Crown Bridge executed an SPA with Bemax, Inc. ("BMXC"), a Nevada corporation headquartered in Dallas, Georgia, pursuant to which it purchased a convertible promissory note from BMXC in the principal amount of $30,000. Crown Bridge funded the note on April 25, 2016.

40. The note had an 8% interest rate and a 12-month maturity date. Crown Bridge was entitled to convert the outstanding principal plus accrued interest, starting 180 days after the

note issuance date. Crown Bridge's conversion price was to be calculated as 52% of the lowest closing bid price (i.e., a 48% discount) of BMXC common stock during the 20 trading days prior to the conversion date. Crown Bridge was entitled to additional discounts of up to 13% (for a total possible discount of 61%) if certain conditions occurred between the funding date and the conversion notice date.

41. BMXC was entitled to prepay any amount understanding under the note within 180 days of the note issuance date for an amount ranging from 130% to 150% of the amount of principal and interest being repaid. Prepayments were prohibited after 180 days.

42. On November 1, 2016, approximately six months and one week after it funded the note, Crown Bridge began to convert the note.

43. In total, Crown Bridge executed five conversions on this note, and was issued 19,416,745 shares of unrestricted, newly issued shares of BMXC common stock, which it acquired at a discount of 48% to 58%. It sold all of these shares into the public markets for substantial profits, usually within a day of conversion.

### Crown Bridge, Soheil, and Sepas Sold Penny Stock

44. Crown Bridge, acting through and under the control to Soheil and Sepas, acquired billons of unrestricted, newly issued shares of common stock through the conversion of convertible notes in entered into with various issuers. During the period in which Crown Bridge acquired and held such shares, the shares did not meet any of the exceptions to the definition of "penny stock," as set forth in Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51-1. [*See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1]. Defendants therefore participated in the offering of penny stocks in connection with the actions undertaken to operate Crown Bridge's convertible notes business.

## COUNT I
### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]
### (Against All Defendants)

45. The SEC re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 44 above.

46. By engaging in the conduct described above, Defendants made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, or to attempt to induce, the purchase and sale of securities for their own account as part of a regular business while not registered with the SEC as dealers, and when Defendants Soheil and Sepas were not associated with an entity registered with the SEC as a dealer.

47. By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

## COUNT II
### Control Person Liability for Violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78t(a)]
### (Against Defendants Soheil Ahdoot and Sepas Ahdoot Only)

48. The Commission re-alleges and incorporates by reference the allegations in Paragraphs 1 through 47 above.

49. As set forth in Count I, Crown Bridge violated Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)].

50. At all relevant times, Soheil and Sepas controlled Crown Bridge and were culpable participants in its violations of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

51. By reason of the foregoing, Soheil and Sepas each are liable as a control person, pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], for Crown Bridge's violations of Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## **RELIEF REQUESTED**

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

**I.**

Finding that the Defendants committed the violations alleged herein.

**II.**

Permanently restraining and enjoining each Defendant, as well as their members, managers, agents, servants, employees, attorneys-in-fact and persons in active concert or participating with them, from violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

**III.**

Ordering each Defendant, jointly and severally, to disgorge, with prejudgment interest, all ill-gotten gains received, directly or indirectly, from the activities set forth in this Complaint, pursuant to Exchange Act 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

**IV.**

Ordering each Defendant to pay civil penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

**V.**

Barring each Defendant from participating in any offering of any penny stock, including by engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

## VI.

Granting such other and further relief that this Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors, including, but not limited to, ordering the surrender and cancellation of any securities (including convertible notes, warrants, and shares) obtained by Crown Bridge in connection with its convertible notes business, during the period January 1, 2016 through December 31, 2020, which are still held by Crown Bridge.

Respectfully submitted,

Dated: August 2, 2022
Washington, DC

SECURITIES AND EXCHANGE COMMISSION

By: *Suzanne J Romajas*
Suzanne J. Romajas
Elliot J. Weingarten*
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-5971
Tel: 202-551-4473 (Romajas)
Email: RomajasS@sec.gov

*Attorneys for Plaintiff*

OF COUNSEL:
  Fuad Rana*

 * *Not admitted in S.D.N.Y.*